**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| WILLIAM B. COWLES, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:13-CV-1741 (JCH) |
|  | : |  |
| v. | : |  |
|  | : |  |
| JOHN McHUGH, in his official | : |  |
| capacity as Secretary of the Army, | : |  |
| Defendant. | : | SEPTEMBER 30, 2014 |
|  | : |  |

**RULING re: MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (Doc. No. 15),**
**MOTION FOR PROTECTIVE ORDER (Doc. No. 19), and**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND 56(d) MOTION (Doc. No. 23)**

Plaintiff William B. Cowles brings this action against Secretary of the Army John

McHugh in his official capacity as Secretary of the Army.  Cowles alleges that he

became disabled with post-traumatic stress disorder ("PTSD") because of his combat

service in 2003, and that the Army erroneously diagnosed him with Adjustment Disorder

(sometimes "AD") at that time.  Less than two months later, the United States

Department of Veteran's Affairs ("VA") diagnosed Cowles with PTSD.  Later on, seeking

military disability retirement pay and other tangible and intangible benefits that accrue to

individuals whom the Army recognizes to have been separated for a disability incurred

because of service, Cowles applied to the Army Board for Correction of Military Records

("ABCMR") to correct his records to reflect that he was separated for PTSD rather than

for AD.  See Application for Correction of Military Record Under the Provisions of Title

10, U.S. Code, Section 1552 (AR 17);[1] 10 U.S.C. §§ 1201, 1552(a)(1).  The ABCMR

---

[1] The administrative record in this case consists of five parts.  AR 1–62 corresponds to Doc. No. 21-1 at 4–65; AR 63–127 corresponds to Doc. No. 8-2, pages 1–65; AR 128–200 corresponds to Doc.

denied Cowles' application.  See ABCMR Decision (AR 3–15).  Now, Cowles sues, arguing that the ABCMR was required to correct his records and award him the corresponding monies, or, in the alternative, that it did not adequately respond to the arguments that he raised.  See Complaint ("Compl.") (Doc. No. 1).  Specifically, Cowles alleges violations of: section 706(2)(A) of title 5 of the United States Code (the provision of the Administrative Procedure Act ("APA") prohibiting agency action that is "arbitrary [or] capricious") in Count I; the Due Process Clause of the Fifth Amendment in Count II; section 504 of the Rehabilitation Act of 1973 in Count III; and section 1201 of title 10 of the United States Code ("the military disability retirement statute") in Count IV.

Now, McHugh simultaneously moves to dismiss all of the counts of Cowles' Complaint and, in the alternative, for summary judgment as to all counts except Count III.  See Defendant's Motion to Dismiss and for Summary Judgment ("Def.'s MTD/MSJ") (Doc. No. 15);  Memorandum of Law in Support of Defendant's Motion to Dismiss and for Summary Judgment ("Def.'s Mem.") (Doc. No. 15-1).  Cowles responds with a Cross-Motion for Summary Judgment on Counts I and IV and, in the alternative, seeks to stay consideration of the defendant's Motions pending discovery.  See Plaintiff's Cross-Motion for Summary Judgment and 56(d) Motion ("Pl.'s MSJ") (Doc. No. 23); Memorandum of Law in Opposition to Defendant's Motion to Dismiss and for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment and Rule 56(d) Motion ("Pl.'s Mem.") (Doc. No. 23-1); see also Defendant's Reply Memorandum

---

No. 21-2 at 1–73; AR 201–257 corresponds to Doc. No. 8-4 at 1–57; and what the court now designates AR 40A, which refers to a page of the brief that Cowles submitted to the ABCMR, which should have followed AR 40 and preceded AR 41, and which was apparently erroneously omitted from the AR as initially submitted to the court, corresponds to Doc. No. 23-5 at 13.

in Support of Motion to Dismiss and for Summary Judgment and Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply Mem.") (Doc. No. 27); Reply Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Reply Mem.") (Doc. No. 34). McHugh also asks the court to preclude all discovery in the case. See Defendant's Motion for Protective Order ("MPO") (Doc. No. 19).

As explained in more detail below, the court concludes that the ABCMR's Decision was flawed in certain key respects and accordingly vacates the ABCMR's Decision and remands the case for further proceedings. The court declines to reach the remainder of the issues raised in the parties' Motions because they are either moot or premature at this time.

## I.    FACTS[2]

William B. Cowles is a 58-year-old resident of Connecticut. On September 21, 1974, Cowles enlisted in the Army National Guard. Defendant's Local Rule 56(a)(1) Statement ("Def.'s L.R. 56(a)(1) Stmt.") (Doc. No. 15-2) ¶ 1; Plaintiff's Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)(2) Stmt.") (Doc. No. 23-3) ¶ 1. During the course of his service, Cowles reached the rank of Sergeant (E-5). Def.'s L.R. 56(a)(1) Stmt. ¶ 2; Pl.'s L.R. 56(a)(2) Stmt. ¶ 2. On February 24, 2003, Cowles was activated for federal service as a member of the 248th Engineering Company, as part of the Connecticut National Guard. Def.'s L.R. 56(a)(1) Stmt. ¶ 4; Pl.'s L.R. 56(a)(2) Stmt. ¶ 4. He deployed to Kuwait (as an equipment specialist) on May 3, 2003. Def.'s L.R.

---

[2] For the purposes of the pending Motions for Summary Judgment, the court accepts as true the undisputed facts in the parties' Local Rule 56(a) Statements and views any disputed facts, as well as the entire record, in the light most favorable to the nonmoving parties.

3

56(a)(1) Stmt. ¶ 5; Pl.'s L.R. 56(a)(2) Stmt. ¶ 5.

After Mr. Cowles arrived in Kuwait, three people from the National Guard unit serving next to him were killed by a combination of sniper fire and a rocket-propelled grenade in an ambush on their humvee and dump truck; Cowles saw the remains when they returned to base.  Plaintiff's Local Rule 56(a)(1) Statement ("Pl.'s L.R. 56(a)(1) Stmt.") (Doc. No. 23-2) ¶ 3; Defendant's Local Rule 56(a)(2) Statement ("Def.'s L.R. 56(a)(2) Stmt.") (Doc. No. 27-1) ¶ 3; AR 124.  He then witnessed a death firsthand, as a soldier repeatedly beat a Pakistani truck driver in the head with the stock of his M-16 rifle until the man stopped moving; he and the other witnesses were instructed not to speak of the death.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 4; Def.'s L.R. 56(a)(2) Stmt. ¶ 4.

On approximately May 27, 2003, Cowles was evacuated from Kuwait to Rota, Spain.  Def.'s L.R. 56(a)(1) Stmt. ¶ 7; Pl.'s L.R. 56(a)(2) Stmt. ¶ 7.  Medical notes reflect that, at the time, he complained of prostate pain, which, the medical records stated, "was alleviated" with a blanket to sit on and "self medicat[ion] with [his] last percocet" pill. AR 73; Pl.'s L.R. 56(a)(1) Stmt. ¶ 5; Def.'s L.R. 56(a)(2) Stmt. ¶ 5; Def.'s L.R. 56(a)(1) Stmt. ¶ 6; Pl.'s L.R. 56(a)(2) Stmt. ¶ 6.  Cowles later reported in a letter to the ABCMR that various extreme stressors, including the aforementioned deaths and other stressors, had caused various symptoms, among which was an inability to have a bowel movement.  AR 125.  After a number of days of these symptoms, he reported, he was suffering "extreme pain in [his] lower left side and nausea," and ultimately "hit total panic and passed out from the pain in [his] bowels."  Id.

On May 28, 2003, Cowles was "screen[ed] for combat-stress related symptoms that are often associated with the development of Acute Stress or Post-Traumatic

4

Stress Disorders."  Def.'s L.R. 56(a)(1) Stmt. ¶ 10; Pl.'s L.R. 56(a)(2) Stmt. ¶ 10; AR

117.  The "screening indicated … severe … symptomatology," AR 117, although

Cowles reported at that time that the source of his stress had been thoughts of his

brother's death from stomach cancer ten years earlier, AR 115.

On May 31, 2003, Cowles was admitted at Walter Reed Army Medical Center.

Def.'s L.R. 56(a)(1) Stmt. ¶¶ 13, 14; Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 13, 14; AR 74.  There,

Cowles later wrote in a letter to the ABCMR that he was kept in the "Psychiatric Lock

Down ward."  AR 125.  He also reported, inter alia, that he was having nightmares,

although the treating medical staff "told [him he] had bad dreams, not nightmares."  Id.

On June 11, 2003, Cowles was discharged from Walter Reed for convalescent

leave, with instructions to report subsequently to Fort Drum, New York.  Def.'s L.R.

56(a)(1) Stmt. ¶ 16; Pl.'s L.R. 56(a)(2) Stmt. ¶ 16; AR 81.  Cowles later reported in his

letter to the ABCMR that he was given "no supervision or treatment at all for a month."

AR 125.

On July 14, 2003, Cowles reported to Fort Drum, New York.  Def.'s L.R. 56(a)(1)

Stmt. ¶ 18; Pl.'s L.R. 56(a)(2) Stmt. ¶ 18; AR 82.  Cowles later reported that he was told

that he "was sent [there] . . . to work on what they told [him] was anxiety and

depression[; n]o one ever mentioned Adjustment Disorder to [him]."  AR 125.  There, he

participated in "weekly group therapy and medication management."  Def.'s L.R.

56(a)(1) Stmt. ¶ 19; Pl.'s L.R. 56(a)(2) Stmt. ¶ 19; AR 84.  Cowles later reported that the

group therapy "wasn't working for [him]."  AR 125.  He also reported needing "to rely on

a quart of vodka to put [him] to sleep at night[, although e]ven then, it was restless

[sleep]."  AR 125–26.  And he says that he was initially told he did not need medication,

but that a friend "took [him] to the clinic . . . to get some meds because [he] was in such bad shape. [He was given] Trazadone [sic] to sleep and Zoloft to help with [shaking hands]." AR 126.

On August 21, 2003, Cowles met with Captain James Demer, Chief of the Division of Mental Health. Def.'s L.R. 56(a)(1) Stmt. ¶ 19; Pl.'s L.R. 56(a)(2) Stmt. ¶ 19; AR 83–84. Cowles later reported to the ABCMR that this meeting was no longer than fifteen minutes. AR 126. Cowles also reported that when he "told [his] doctor Captain Demers [sic] about [the medications], [Demer] got really mad. [Cowles also] told [Demer] that [Cowles'] bad dreams were turning [him] to drink excessively, too, but [Demer] didn't like hearing that either and didn't make any more attempts to speak with [Cowles] about what was wrong and what [Cowles] needed to do to get better." AR 126.

"[B]ased on clinical interview and collateral information," Demer wrote in a memorandum, Cowles "appears to be suffering from depressive and anxiety symptoms that occurred within the setting of difficulties adjusting to deployment." Def.'s L.R. 56(a)(1) Stmt. ¶ 20; Pl.'s L.R. 56(a)(2) Stmt. ¶ 20. He noted that Cowles' "condition had improved." Id. He recommended that Cowles be "demobilized and returned home for further disposition." Id.; AR 84.

In a "Developmental Counseling Form" dated August 27, 2003, Captain Kurt Walling reported that he advised Cowles that he was considering separating him under Army Regulation 635–200 for a disorder under paragraph 5–17 of that Regulation. Def.'s L.R. 56(a)(1) Stmt. ¶ 21; Pl.'s L.R. 56(a)(2) Stmt. ¶ 21. He noted that Cowles "still exhibit[ed] symptoms of depression" despite having "been seen regularly by mental

6

health and group provider."  Id.  He advised that he would seek an official mental evaluation to consider separating Cowles for a paragraph 5–17 mental disorder "if this behavior continues."  Id.; AR 82.

On September 2, 2003, Captain Demer formally evaluated Cowles and gave a diagnosis of "Adjustment Disorder with mixed anxiety and depressed mood," noting "severe difficulties adjusting to the stresses associated with deployment" and that Cowles' "symptoms are likely to reoccur with future deployments;" he recommended Cowles for separation for Adjustment Disorder under paragraph 5–17.  Def.'s L.R. 56(a)(1) Stmt. ¶¶ 22, 23; Pl.'s L.R. 56(a)(2) Stmt. ¶¶ 22, 23.

On September 25, 2003, approximately four months after his May 27 medical evacuation from Kuwait to Rota, Spain, Cowles was released from active duty with an Honorable Discharge on the basis of an "other designated physical or mental condition" under Army Regulation 635–200, ¶ 5–17, and was discharged from the Connecticut National Guard and assigned to the Retired Reserve.  Def.'s L.R. 56(a)(1) Stmt. ¶ 25; Pl.'s L.R. 56(a)(2) Stmt. ¶ 25; AR 72, 87.

At no point prior to his discharge did Cowles believe that he had service-connected PTSD.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 13; Def.'s L.R. 56(a)(2) Stmt. ¶ 13.

On November 19, 2003, 175 days after his medical evacuation, VA staff evaluated Cowles and diagnosed him with PTSD.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 17; Def.'s L.R. 56(a)(2) Stmt. ¶ 17; Def.'s L.R. 56(a)(1) Stmt. ¶ 26; Pl.'s L.R. 56(a)(2) Stmt. ¶ 26. The VA rated Cowles 30% disabled for service-connected PTSD on March 2, 2004, and subsequently increased his disability rating to 50%, 70%, and then 100%.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 20; Def.'s L.R. 56(a)(2) Stmt. ¶ 20.

On June 14, 2012, Cowles applied to the ABCMR for review of his discharge status, asking the Board to change his records so that he could receive the benefits that he would have received had he been awarded them originally under section 1201.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 26; Def.'s L.R. 56(a)(2) Stmt. ¶ 26.  The ABCMR denied his application.  Pl.'s L.R. 56(a)(1) Stmt. ¶ 33; Def.'s L.R. 56(a)(2) Stmt. ¶ 33; see ABCMR Decision.  Cowles filed the Complaint on November 21, 2013.

## II.    DISCUSSION

Cowles' basic contention is that the ABCMR erroneously ratified the flawed AD diagnosis that the Army gave when it separated him.  As a consequence, he argues, the ABCMR deprived him of the tangible and intangible benefits of being categorized by the Army as an individual who suffers from PTSD.  He asks this court to order the ABCMR to correct the relevant records, to pay him what he would have earned in the past had it not taken its illegal actions (up to $10,000), and to pay him the benefits to which his records, as adjusted, would entitle him.  In the alternative, he asks that the court vacate the Decision of the ABCMR and remand the case to the ABCMR with instructions to correct certain procedural errors in its treatment of Cowles' application for correction of his records.

At this time, the court determines that it is appropriate to rule on Count IV (the section 1201 claim) and Count I (the APA claim).  With both of these related counts, Cowles seeks reversal or, in the alternative, vacatur of the ABCMR's Decision and remand of the case.  Moreover, both counts allege the same substantive agency errors and provide for court review of the relevant agency action according to the same standard of review: the question is whether the Decision was arbitrary, capricious, or

otherwise not in accordance with law.  See Fisher v. United States, 402 F.3d 1167, 1180 (Fed. Cir. 2005) (same standard applies in APA and section 1201 cases).

For purposes of this case, the only potentially relevant distinction between these two counts lies in the remedies that the court may award.

The court has jurisdiction of the claim in Count IV for violation of section 1201 under the "Little" Tucker Act ("LTA"), 28 U.S.C. § 1346(a)(2).  The LTA allows the United States District Court to take jurisdiction of a "civil action or claim against the United States, not exceeding $10,000 in amount," including one for violation of section 1201.[3]  See Fisher, 402 F.3d at 1175.  It empowers the courts primarily to award damages—with equitable relief perhaps only if incidental or collateral thereto—where violations of the requirements of section 1201 occur.  See Randall v. U.S., 95 F.3d 339, 346–48 (4th Cir. 1996)

The court also has jurisdiction of the claim in Count I under the Administrative Procedure Act.  Section 702 of the APA waives sovereign immunity for suits "seeking relief other than money damages."   5 U.S.C. § 702.

A.    McHugh's Motion to Dismiss for lack of subject matter jurisdiction

With regard to Counts I and IV, McHugh asserts that jurisdiction in this court is improper.  As to Count IV, McHugh argues that the six-year limitations period has run.  As to Count I, he argues that an adequate remedy exists at law—namely, via the cause of action raised in Count IV—so that section 704 of the APA, 5 U.S.C. § 704, bars the court from hearing this claim.

---

[3] Cowles waives any claim to damages in excess of $10,000, and thus argues that this court has jurisdiction to hear the claim in Count IV under the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2).

1.      Standard of review

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the district court lacks the statutory or constitutional power to adjudicate the case.  See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 254 (2010).  The plaintiff bears the burden of establishing that the court has jurisdiction.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

2.      Claim for military disability retirement benefits, 10 U.S.C. § 1201

Count IV of Cowles' Complaint seeks relief for a violation of section 1201 of title 10 of the United States Code, the military disability retirement benefits statute.

McHugh argues that the limitations period has run for any claim for relief that Cowles may have had under the military disability retirement benefits statute and that the court must thus dismiss this claim for lack of jurisdiction.  See 10 U.S.C. § 1201. The length of the limitations period for a section 1201 claim is six years.  See 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.").  Cowles, as the plaintiff, carries "the burden of establishing jurisdiction, including jurisdictional timeliness."  Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors Acceptance Corp. of Indiana, Inc., 298 U.S. 178, 189 (1936)).  The general rule is that a claim under section 1201 accrues when a service member pursues benefits under that statute before a military retirement board and the board denies that claim or where a service member requests consideration of such a claim and a board refuses to hear the claim.  Chambers v. United States, 417 F.3d 1218, 1226–27 (Fed. Cir. 2005); see also Real v. United States,

906 F.2d 1557, 1560 (Fed. Cir. 1990).  The Federal Circuit has provided, as an extension of this general rule, that a service member's "failure to request a hearing board prior to discharge" will have "the same effect as a refusal by the service to provide board review . . . when the service member has sufficient actual or constructive notice of his disability . . . to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge." Chambers, 417 F.3d at 1226 (discussing Real, 906 F.2d at 1560–63).

McHugh asks this court to dismiss Cowles' section 1201 claim on the grounds that Cowles falls into the latter category, i.e., that he knowingly waived consideration of any section 1201 claim at the time of his discharge.  See Def.'s Mem. at 10–15.  For the court to conclude that Cowles effected such a waiver, Cowles must have "understood the full extent of his mental problem" at the time he executed the alleged waiver.  Real, 906 F.2d at 1563 (finding no waiver where "the only diagnosis [at discharge] was LCdr Kelley's determination that [the claimant's condition] was drug-induced"—a benefits-disqualifying fact under section 1201—and "no one knew exactly what was wrong with Real or understood the full extent of his mental problem . . . or whether it was service-connected"); see also Chambers, 417 F.3d at 1226–27 (finding no waiver where the medical diagnoses that the claimant received "all indicated that his condition was minor, temporary, and circumstantial" and "[n]othing in the record indicate[d] that [the claimant] considered these diagnoses to be erroneous").

However, the court cannot see any basis in the record for finding that Cowles thought that he might, let alone knew that he did, have PTSD at the time of this purported waiver.  Moreover, McHugh conceded at oral argument that the record only

11

supports the conclusion that Cowles did not know he had, or might have had, PTSD at the time of the purported waiver.  Given all of this, and Cowles' own statements, including, for example, that "I wasn't told that I had PTSD until I got to the VA, and this was only a few weeks after I was discharged," AR 127, the court concludes that the limitations period did not begin to run until the ABCMR issued its final adverse Decision on Cowles' claim for military disability retirement benefits in November 2012.  Because that was less than six years before Cowles filed his Complaint (November 2013), McHugh's argument that this court is without jurisdiction to hear the section 1201 claim fails.

> 3.     Claim of arbitrary or capricious agency action, 5 U.S.C. § 706(2)(A)

The APA limits review to injuries "for which there is no other adequate remedy in a court."  5 U.S.C. § 704; see also Bowen v. Massachusetts, 487 U.S. 879, 901–08 (1988).  McHugh argues that section 704 bars the jurisdiction otherwise available under the APA in this case because the plaintiff states a claim for damages under section 1201 of title 10 of the United States Code.  However, he makes no serious attempt to argue that a damages remedy is "adequate" in this particular case: his best effort consists of an assertion that a damages remedy is "presumptively" adequate.  See Def.'s Mem. at 15–16.  McHugh overlooks the fact that Cowles seeks not just a damages award for past benefits to which he believes he was entitled, but that he also seeks a nontrivial order requiring that his records be corrected and that he receive future benefits according to what such records (once corrected) would require.  A records correction is not a damages award.  Nor, for that matter, would be an order to provide future payments.  This relief is all within the traditional scope of "equitable"

relief, is not merely "incidental" to the money damage claim, and would thus normally be the appropriate subject of a suit under the APA.  See Calloway v. Brownlee, 366 F. Supp. 2d 43, 52–53 (D.D.C. 2005).

Cowles may be dedicated to obtaining his up to $10,000 damages remedy under his LTA claim, but he appears far more interested in having his records changed and obtaining the intangible benefits and entitlement to future benefits that would flow from this change.  See Declaration of William B. Cowles (Doc. No. 23-4) ¶¶ 1–5.  The court also concludes that this remedy is a far more substantial one than, and surely not collateral or incidental to, his LTA remedy.  The LTA remedy would not provide Cowles adequate relief in light of the harm he alleges.  Accordingly, this aspect of McHugh's Motion to Dismiss is denied.

B.     The Motions for Summary Judgment

In the alternative to his Motion to Dismiss, McHugh moves for summary judgment on Counts I and IV.  Cowles cross-moves for summary judgment on these counts.

The first question here is whether the Army acted appropriately in determining what illness afflicted Cowles when it separated him from service.  The court answers this question in the negative.  The second question, then, is what the ABCMR needed to do under such a circumstance.  The court, mindful that it is not a maker of military policy, that it does not sit as a finder of fact in this case, and that it is expert in neither medicine nor military matters, nonetheless concludes that the ABCMR must be guided by its statutory power to "correct any military record" if, given the Army's apparent improper diagnostic procedures in this case and any other facts and decisions at which

the ABCMR arrives, it "considers [such action] necessary to correct an error or remove an injustice."  10 U.S.C. § 1552.

    1.  Standard of review

   Whether challenged under section 1201 or under the APA, an ABCMR decision is reviewed on the same basis.  See Fisher v. United States, 402 F.3d 1167, 1180 (Fed. Cir. 2005).  The court reviews the fact-finding, the legal judgment, and the discretionary decisions of the agency, the first to ensure that "substantial evidence" supports the agency's judgment and the latter two to set aside agency decisionmaking that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

   "Substantial evidence is more than a mere scintilla. It [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consol. Ed. Co. of N.Y. v. NLRB, 305 U.S. 197, 217 (1938).  This "standard of review does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence."  Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (emphasis in original).

   The ABCMR commits legal error if it acts in violation of controlling "law, regulation, or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced," Heisig, 719 F.2d at 1156, or if it is insufficiently reasoned—because, for example, it does not connect facts to conclusions or fails to respond to plausible arguments, see Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Fox Television Stations, Inc. v. FCC, 280 F.3d 1027, 1051 (D.C. Cir. 2002) (where agency "did not address" certain arguments,

"[t]hese failings alone require that we reverse [the Decision] as arbitrary and capricious"

(citing State Farm)).

The statute that empowers the ABCMR to correct military records vests the

ABCMR with a special discretion when it decides whether to correct a record.  See 10

U.S.C. § 1552(a)(1).  As the Court of Appeals for the District of Columbia Circuit opined

in Kreis v. Sec'y of Air Force:

> the broad grant of discretion implicated [in section 1552] does not entirely
> foreclose review of the Secretary's action, [but it] does substantially restrict the
> authority of the reviewing court to upset the Secretary's [ultimate] determination.
> It is simply more difficult to say that the Secretary has acted arbitrarily [where, as
> here,] he is authorized to act "when he considers it necessary to correct an error
> or remove an injustice," 10 U.S.C. § 1552(a) (emphasis added), than it is if he is
> required to act whenever a court determines that certain objective conditions are
> met, i.e., that there has been an error or injustice.

866 F.2d 1508, 1514 (D.C. Cir. 1989); see also Dickson v. Sec'y of Defense, 68 F.3d

1396, 1402–04 (D.C. Cir. 1995) (observing that decisions under section 1552(a)(1) are

subject to review despite permissive nature of the "may correct" language and holding

that decision to waive expiry of limitations period "if [the board] finds it to be in the

interest of justice" is also subject to judicial review for rationality).

### 2.    The Army's error

The dispute presently before the court centers on the way that the Army treats

individuals afflicted in the course of their service with mental health issues, specifically

with AD and PTSD.  Cowles' basic contention about the Army's actions in this case is

that the Army failed to process him in a permissible way and that this failure is the

reason why he cannot now show that the Army's conclusion that he had AD was

incorrect and that he instead had PTSD at the time of discharge.  See Pl.'s Mem. at 1,

9–11, 15.  The court concludes that it was error for the Army to separate Cowles for

Adjustment Disorder without allowing him (in whatever lawful arrangement the Army deemed appropriate) up to six months from the onset of his symptoms to determine if he did suffer from AD.

Certain statutes and regulations bind the Army when individuals leave the service because of mental health impairments.  Section 1201 of title 10 of the United States Code requires the Army to retire and provide certain benefits to an individual who meets certain prerequisites, notably including diagnosis with a qualifying "disability."  10 U.S.C. § 1201(a), (b); see also Fisher v. United States, 402 F.3d 1167, 1174–75 (Fed. Cir. 2005) (if an individual meets section 1201's requirements, payment of benefits is mandatory, not discretionary).  PTSD qualifies as a "disability" for purposes of section 1201, but AD does not.  An individual who is suspected to have PTSD may be referred for medical evaluation and, if found to suffer from service-induced PTSD and to meet other relevant criteria, will be retired with an entitlement to certain tangible benefits.

The Army also removes some individuals with mental health issues from service without entitlement to the disability retirement benefits that section 1201 mandates.  See Army Reg. 635–200 (entitled "Active Duty Enlisted Administrative Separations") ("Commanders . . . may approve separation under this paragraph on the basis of other . . . mental conditions [including Adjustment Disorder] not amounting to disability . . . that potentially interfere with assignment to or performance of duty."  Id. ¶ 5–17(a) (emphasis added)).   Adjustment Disorder is such a "mental condition."  See Army Regulation 40–501 (entitled "Standards of Medical Fitness"), ¶ 3–36 (entitled "Adjustment disorders") (providing that AD "may" under certain circumstances "be the

basis for administrative separation," but "do[es] not render an individual unfit because of physical disability").

If the Army intends to separate someone from service for Adjustment Disorder, it is required to adhere to certain procedural requirements.  These prerequisites to separation, which indicate a strong policy in favor of retaining soldiers and helping them recuperate from temporary ailments such as AD whenever possible, include counseling and providing "ample opportunity to overcome" or "rehabilitat[e]" from the disorder.  See Army Reg. 635–200, ¶¶ 1–16, 5–17.[4]

Adjustment Disorder is a temporary ailment; it rarely lasts longer than six months. See Letter from Dr. Mourra (AR 133–36) at 2 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV-TR)); see also Army Reg. 40–501, Note to Chapter 3 (invoking the DSM-IV for its definitions of the maladies described in much of the chapter, specifically including paragraph 3–36,

---

[4] Paragraph 5–17(c) provides:

Separation processing may not be initiated under this paragraph until the soldier has been counseled formally concerning deficiencies and has been afforded ample opportunity to overcome those deficiencies as reflected in appropriate counseling or personnel records. (See ¶ 1–16.)

Army Reg. 635–200 ¶ 5–17 (Effective January 1, 2001) (emphases added).  Paragraph 1–16(a) of the same regulation further provides:

Army leaders at all levels must be continually aware of their obligation to provide purpose, direction, and motivation to soldiers.  It is essential that soldiers who falter, but have the potential to serve honorably and well, be given every opportunity to succeed.  Effective leadership is particularly important in the case of soldiers serving their initial enlistments.  Except as otherwise indicated in this regulation, commanders must make maximum use of counseling and rehabilitation before determining that a soldier has no potential for further useful service and, therefore, should be separated.  In this regard, commanders will ensure that adequate counseling and rehabilitative measures are taken before initiating separation proceedings for . . . reasons [including certain] designated physical or mental conditions. (See ¶ 5–17)

Id. ¶ 1–16 (emphases added).

which defines Adjustment Disorder).  It is perhaps for this reason that symptoms of Adjustment Disorder are not valid grounds for separating a soldier unless "recurrent." See Army Reg. 40–501, ¶ 3–36 ("Situational maladjustments due to acute or chronic situational stress . . . may be the basis for administrative separation if recurrent and causing interference with military duty." (emphasis added))

Cowles argues that the Army's decision to separate him for AD without giving him up to six months of time to recover violated Army Regulation 635–200's commands. Def.'s Mem. at 15–16; Brief to the ABCMR (AR 19–47)  at 14–17; see also Blassingame v. Sec'y of the Navy, 866 F.2d 556, 560 (2d Cir. 1989) ("It is axiomatic that an agency of the government must scrupulously observe its own rules, regulations, and procedures.").  He specifically points to paragraph 5–17, with its "ample opportunity to recover" language,  and he defines "ample opportunity" by reference to the medical opinion in Dr. Mourra's letter.  His expert evidence states that an appropriate period to allow for an individual to recover from AD would normally be six months.  Letter from Dr. Mourra at 2.  Cowles further notes, supported by his expert evidence, that it is not accepted medical practice to diagnose someone as having AD without waiting this six-month period, given a "gray area" between PTSD and AD that makes it difficult or impossible to determine which of the two diagnoses is correct without waiting to see for up to six months whether an individual recovers from AD. [5]  See id.  His ultimate

---

[5] In coming to this conclusion about the validity of Cowles' evidence (in the letter from Dr. Mourra) that AD symptoms do not last longer than six months, the court necessarily concludes the ABCMR Decision acted arbitrarily in several ways.

First, the ABCMR erred by failing even to consider this argument, which was "not . . . frivolous on [its] face and could [have] affect[ed] the Board's ultimate disposition;" this rendered "the Board's decision . . . arbitrary." Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997); see Pl.'s Mem. at 18. McHugh responds, "The ABCMR considered this argument and appropriately rejected it."  Def.'s Reply Mem. at 17

contention here is that, had the Army given him up to six months, it would have seen

that he did not recover from his symptoms as a diagnosis of AD required.  Instead, the

Army would have realized its misdiagnosis and properly diagnosed him with PTSD, as

the VA did aproximately five and one half months after removal from Kuwait.

    McHugh does not attempt to rebut Cowles' expert evidence on what an "ample

opportunity" was under these circumstances, but instead responds that what an ample

opportunity is should be decided by military commanders and not doctors.  See Def.'s

Reply Mem. at 17–19 (citing Army Reg. 635–200, ¶¶ 5–17(b), (c), 1–16(b)(1)).  He

---

(citing ABCMR Decision at 2, 7); Def.'s L.R. 56(a)(2) Stmt. ¶ 40 ("Denied." (citing ABCMR Decision at 12, ¶¶ 6c, 6e, and a page range spanning entire ABCMR Decision)).  The court finds no treatment of this issue on its merits by the ABCMR; the ABCMR only recited that it received the relevant document, ABCMR Decision at 1, and then recited the argument, id. at 7, but never responded to or analyzed the argument.

    Second, McHugh argued, "This conclusion [that allowing up to six months was required as a matter of good medical practice] ultimately was part of the post hoc medical opinion which the Board rationally discounted as being made 9 years post separation, and based on records which were not made available by Plaintiff."  Def.'s Mem. at 34 (citing ABCMR Decision at 7 ¶ 19e, 12 ¶ 6e).  This assertion seriously mischaracterizes much of Dr. Mourra's letter.  The last portion does draw conclusions that combine Dr. Mourra's opinions about the generally appropriate treatment period with Mr. Cowles' particular treatment records.  See AR 136.  However, earlier portions of her letter state:

> PTSD generally occurs as a reaction to a  life-threatening event and tends to last longer.  Adjustment disorder, on the other hand, is short-term, rarely lasting longer than six months.  In general, when someone's symptoms in reaction to a stressor that is *not* ongoing persist past 6 months, it is generally recognized that the condition is likely not Adjustment Disorder and has crystallized into something else, requiring re-evaluation.
> . . .
> How long do individuals normally retain a diagnosis of adjustment disorder?
> As detailed above, they will typically retain the diagnosis for no more than 6 months.
> . . .
> How long after the occurrence of the precipitating stressor(s) can adjustment disorder continue?
> Typically 6 months.

Letter from Dr. Mourra at 2, 3.  Cowles argues, and the court agrees, that not accepting an expert's diagnosis of an individual based upon review of records long afterward (and records not submitted to the ABCMR) does not ipso facto discredit her judgment about the appropriate period of time as a matter of medical practice.  See Pl.'s Mem. at 18; Pl.'s L.R. 56(a)(1) Stmt. ¶ 40 (citing a page range spanning entire ABCMR Decision, 3–15, and AR 33–38).  To the extent that the ABCMR rejected Dr. Mourra's general opinion about Adjustment Disorder on the basis of her familiarity with Cowles in particular, this was unreasonable.

notes that ¶ 1–16(b)(1) of Army Regulation 635–200 specifies that, for a separation due

to an adjustment disorder,

> [t]he number and frequency of formal counseling sessions are discretionary. Such factors as the length of time since the prior counseling, the soldier's performance and conduct during the intervening period, and the <u>commander's</u> assessment of the soldier's potential for becoming a fully satisfactory soldier, must be considered in determining if further counseling is needed."

Def.'s Reply Mem. at 17–18 (quoting Army Reg. 635–200 ¶ 1–16(b)(1)) (emphasis

added by McHugh; quotation marks omitted).   He argues that this Regulation does not

itself determine what constitutes an ample opportunity and that it vests commanders

with wide discretion, which it would be "inappropriate[ to] supplant[ ]."  Def.'s Reply

Mem. at 18.

The language that McHugh cites is irrelevant: paragraph 1–16(b)(1) purports to

control only the "number and frequency of formal counseling sessions" before

separation proceedings may be initiated.   Indeed, the title of paragraph 1–16(b) is

"Counseling"—not "time period for rehabilitation or diagnosis."   The existence of this

language is no reason to think that the term "ample opportunity" is to be defined

according to the discretion of military commanders.

McHugh also invokes broader concerns about separation of powers, the "respect

for duty and a discipline without counterpart in civilian life," and the fact that "the

composition, training, equipping, and control of a military force, are essentially

professional military judgments."  <u>See</u> Def.'s Reply Mem. at 18 (quoting <u>Schlesinger v.

Councilman</u>, 420 U.S. 738, 757 (1975) and <u>Gilligan v. Morgan</u>, 413 U.S. 1, 10 (1973)).

These concerns, he argues, would render inappropriate a decision that military

commanders erred in determining that Cowles had "ample opportunity" to recover in this

case (assuming they did so determine).  Id.  He contended similarly at oral argument that it would be inappropriate to second guess what he referred to several times as a "command decision."

The court is mindful of the importance of deferring to the military on questions that are outside the competence or the power of the courts to adjudicate.  However, McHugh's reference to the importance of deference to military decisions does not persuade the court that it is inappropriate for the courts to review the military's interpretation of "ample opportunity."  It is not clear that the determination at issue here has any bearing on the "essentially professional military judgments" of "the composition, training, equipping, and control of a military force," let alone such a bearing that the court must defer completely to the military.  Gilligan, 413 U.S. at 10.  And none of the case law that McHugh cites actually goes as far as he would suggest.  All of these cases reason that Congress has not, as a rule, meant to allow suits that would undermine the "strict discipline and regulation" necessary to the central functioning of the military.  Chappell v. Wallace, 462 U.S. 296, 300 (1983).  This rationale extends to suits relating to active military service and disciplinary procedures: e.g., challenging court-martial proceedings or deployment of the National Guard.  See Schlesinger, 420 U.S. at 757; Gilligan, 413 U.S. at 10.  Disputes that relate to the armed services, but do not in any way undermine the strict discipline and regulation necessary to their functioning, do not fall within the scope of this salutary rule.  See Dickson v. Sec'y of Defense, 68 F.3d 1396, 1402–04 nn.8–10 (D.C. Cir. 1995).

The record indisputably establishes that the Army made a final classification of Cowles as "unfit for further military service," see Army Reg. 40–501, ¶ 3–1, because of

Adjustment Disorder, <u>see</u> <u>id.</u> ¶ 3–36, without allowing up to six months to determine if he in fact had AD.  The court concludes that this action by the Army was unlawful because it violated the Army's own regulations, which, <u>inter alia</u>, require that soldiers be given "ample opportunity" to recover from AD before separation, set a policy heavily in favor of rehabilitating soldiers, and invoke the standards of the medical community.  The Army was permitted to use any lawful means to achieve these ends, but making its final determination in this case in less than six months was impermissible under its own Regulations.

        3.      The ABCMR's error

Cowles' challenge is, however, not directly to the Army's diagnostic procedures; he rather challenges the ABCMR's reliance on the Army's ultimate diagnosis.  <u>See</u> Pl.'s Mem. at 15–16.

The court concludes that the ABCMR committed error by relying on the Army's diagnosis under these circumstances.  Indeed, it explicitly noted that "[Cowles'] narrative reason for separation is correctly shown on [an Army form related to discharge] and he has provided insufficient evidence to warrant changing this reason." ABCMR Decision at 13; <u>see also</u> <u>id.</u> at 7 (noting that an Army form indicated that Cowles was discharged under paragraph 5–17 of Army Regulation 635–200).  In other words, it rested its Decision, in significant part, on the conclusion that the Army's diagnosis was presumptively free from fault.

Given the Army's violations of the requirements that the law imposes on it when it classifies soldiers at the time of discharge, <u>see</u> discussion <u>supra</u> Section II.B.2, the ABCMR was bound to address how the inadequacy of the Army's procedures would

affect its resolution of Cowles case.  It did not do so.  Instead, it simply relied upon the presumptive legitimacy that it normally gives Army diagnoses when considering a challenge like that of Cowles.  It appears to the court to have been a foregone conclusion that any post-separation evidence that Cowles presented was inadequate to rebut the presumption of the regularity of the Army's procedures.  The court can only conclude, then, that the ABCMR committed prejudicial error in its processing of Cowles' application to it because it failed to consider the inadequacy of the diagnostic procedures that the Army used in Cowles' case.

4.      Relief

Cowles requests that this court reverse the Decision of the ABCMR and order a correction of his records and award back and front military disability retirement pay.  In the alternative, he seeks vacatur of the Decision and remand of the case.

Because the ABCMR found no error in the Army's procedures, the ABCMR did not reach the question whether, under the standard laid out in section 1552(a)(1), a records correction was necessary on the basis of such an error.  Section 1552(a)(1) affords the ABCMR substantial discretion in determining whether a record correction is "necessary" to "remove an injustice."  10 U.S.C. § 1552(a)(1).  Because of the lack of developed case law of which this court is aware that would narrow such discretion, the court is not inclined to conclude at this time that this is "a case in which [it] can say that the Board was necessarily compelled to grant" Cowles the ultimate relief that he sought. Thomson v. Merit Systems Protection Bd., 772 F.2d 879, 882 (Fed. Cir. 1985).  The court thus declines to reverse the Decision of the ABCMR outright.  It instead vacates

that Decision and remands the case to the Board for further proceedings consistent with this Ruling.  See id.

On remand, the ABCMR may, of course, render any decision consistent with the record, this Ruling, and other controlling law.  The court further instructs the ABCMR as to those rules that always apply, but which the court raises in light of the ABCMR's failure to consider Cowles' argument that the Army's diagnostic procedures were faulty.  The ABCMR is required to "take whatever steps it needs to provide an explanation that will enable [a reviewing] court to evaluate [its] rationale."  Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).  The ABCMR is, furthermore, required "to address [all] arguments that are not facially frivolous."  Frizelle v. Slater, 111 F.3d 172, 174 (D.C. Cir. 1997).

## III.     CONCLUSION

Summary judgment is granted to Cowles as to his APA and section 1201 claims (Counts I and IV) and McHugh's Motion for Summary judgment is denied as to the same claims.  The court retains jurisdiction pending the ABCMR's reconsideration of Cowles' claim.  The action before this court is closed administratively pending the remand.  The parties are to file joint status reports to this court every 60 days, with the first due November 15, 2014.

McHugh also moved for summary judgment on his constitutional Due Process claim and on additional bases as to his APA and section 1201 claims not addressed by the court in this Ruling.  Because the Ruling's grant of summary judgment (and its order of vacatur and remand) may result in further agency action that will moot these remaining parts of Cowles' claims, or may alter the nature of these claims if Cowles opts

24

to pursue them after a subsequent decision by the ABCMR, the court terminates these portions of McHugh's Motion as premature, without prejudice to renew.  Likewise the court terminates McHugh's Motion to Preclude All Discovery and those portions of McHugh's Motion to Dismiss not addressed to the APA and section 1201 claims as premature, without prejudice to renew.

Therefore, Cowles' Motion for Summary Judgment (Doc. No. 23) is **GRANTED**; McHugh's Motion for Summary Judgment (Doc. No. 15) is **DENIED IN PART**, as to the APA claim and the section 1201 claim, and **TERMINATED AS PREMATURE IN PART**, as to the remainder; McHugh's Motion to Dismiss (Doc. No. 15) is **DENIED IN PART**, as to the APA claim and the section 1201 claim, and **TERMINATED AS PREMATURE IN PART**, as to the remainder; McHugh's Motion for Protective Order (Doc. No. 19) is **DENIED AS MOOT**.

The Decision of the ABCMR is **VACATED** and the case is **REMANDED** for further proceedings consistent with this Ruling.  The case is administratively closed with the right to reopen at any appropriate time.

**SO ORDERED**.

Dated this 30th day of September 2014 at New Haven, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge